## LAWSON v. FLOYD.

APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES FOR
THE DISTRICT OF WEST VIRGINIA.

Argued December 22, 1887. — Decided January 9, 1888.

In 1857 F. and L. entered into an agreement whereby F. was to convey to L. two tracts of land at an assumed value of $26,000, on which was an indebtedness estimated at about $18,000. L. was to assume and pay that indebtedness, and was to convey to F. "five town lots" and "about 1000 acres of land," "being all the lands owned by said L." at that place, all valued at $10,000; and F. was to pay to L. what might be found due on these assumed values after adjusting the indebtedness. Each party took possession of the lands acquired by the exchange. F. conveyed to L. and L. assumed and paid the indebtedness. L. retained title of the lands to be conveyed to F. until F. should pay the difference. In 1871, the amount being unpaid, L. brought suit against F. and J. to whom F. had conveyed a portion of the land. This suit was compromised by a further agreement in which the tract was described as land "sold by said L. to said F. estimated to contain 1000 acres." On a survey had after that compromise it was found that the tract in question fell much short of 1000 acres. F. filed this bill in 1877, seeking, among other things, to prevent the collection of the difference found due to L. in the original exchange, on the ground that the contract was for a conveyance of 1000 acres, and that the representations of, L. in this respect had been false and fraudulent. Held:

  (1) That, taken in connection with all the facts proved, L.'s representation could not be regarded as fraudulently made;

  (2) That, the governing element in the transaction being that it was an exchange of several tracts of land between the parties, the contract was not to be construed by the strict rule which might govern its interpretation if it were an independent purchase to be paid for in money;

  (3) That, thus construed, it was not an agreement by L. that the tract contained 1000 acres, which bound him to make good the difference between 1000 acres and the quantity found within the boundaries by actual survey.

BILL IN EQUITY.   Decree for the complainant.   Respondent appealed.   The case is stated in the opinion of the court.

*Mr. James H. Ferguson* for appellant.

*Mr. Cornelius C. Watts* for appellee.

Mr. Justice Miller delivered the opinion of the court.

On the second day of December, 1857, George R. C. Floyd, the appellee in this case, and Anthony Lawson, the appellant, entered into a written agreement for the exchange of several tracts of land which were owned by Floyd for another tract of land owned by Lawson. These tracts were in different parts of the country, and those held by Floyd were encumbered by an indebtedness amounting to over $18,000, which Lawson assumed to pay. In adjusting the exchange of these tracts, those which were to be conveyed by Floyd to Lawson were estimated at $26,000, and the property which Lawson agreed to convey to Floyd at $10,000. The balance which by these estimates would be due from Floyd to Lawson, after Lawson had paid the encumbrances on the Floyd property, some two or three thousand dollars, was left a little uncertain by reason of the necessity of ascertaining the amounts due on some of the liens, and was to be paid by Floyd in cash.

The contract for this exchange, which is appended to the bill in this suit as Exhibit A, is as follows:

"Memorandum of an agreement, made this 2d day of December, 1857, between George R. C. Floyd, of the one part, and Anthony Lawson, of the other part, witnesseth: That the said Floyd has sold to the said Lawson, for $26,000, two several tracts of land lying in the west end of Burke's Garden, in the county of Tazewell, one known as the Waterford Place and supposed to contain eight hundred and two acres, and the other known as the Smith Place, adjoining the other, and supposed to contain four hundred and sixty-seven acres; the title to the Waterford Place is in John B. Floyd; and the said George R. C. Floyd binds himself to procure a deed therefor to the said Lawson, with general warranty and relinquishment of dower; and the title to the Smith Place is in one Ballard P. Smith, who will make a deed therefor, with general warranty and relinquishment of dower, upon the payment of the purchase money hereinafter named; and the said Floyd is to deliver possession of said tracts of land at once;

and the said Lawson for the said tracts of land binds himself to pay as follows, viz.: To Ballard P. Smith the amount for which said Smith Place sold for under a decree of the Circuit Court of Washington County, which is supposed to be $8410, but if that is not the correct sum, it is to be ascertained, and to pay to A. S. Gray the sum of $9850, which may be paid in three instalments of $3283.33 each — one due January 1st, 1859, one due January 1st, 1860, and the other due January 1st, 1861, each bearing interest from January 1st, 1858, — and also to convey to the said Floyd the property of said Lawson at Logan Court House, consisting of five half-acre lots, viz., Nos. 8, 9, 10, 11, and 12 in the original plan of the town of Lawnsville, now Aracoma, and about 1000 acres of land lying on the east side of Guyandotte and north of Aracoma, being all the lands owned by said Lawson below or north of Kezer's Branch, lying back of lots Nos. 6 and 7, and below the public square, and down as far as McDonald's land, and the said Lawson puts the property at $10,000, and the said Lawson is to make the said Floyd a deed, with general warranty and relinquishment of dower, to the above described property, except one recent grant and part of another tract lying back from the river, which he is only to convey specially, and the said Lawson is to deliver possession of the lands and lots by 1st March next, except the storehouse and dwelling-house, and — of them by the 1st of May next; and whereas the above payment to Gray and Smith, and the above property at $10,000, makes more than the sum of $26,000, which the two tracts of land in the garden are rated at, it is agreed that the difference, whatever it may be, between $6000 and the sum necessary to be paid to Smith shall be due from said Floyd to said Lawson, to be paid when said Lawson delivers possession of the lands, lots, &c., at Aracoma, and the said Lawson has the privilege of retaining the title to the land to be conveyed by him till the said balance is paid.

"Witness the following signatures and seals.

"GEO. R. C. FLOYD.     [Seal.]
"A. LAWSON.            [Seal.]"

Each party took possession of the property which he acquired under this exchange, and Lawson paid the liens on the property which he received from Floyd and had the title conveyed to himself. The balance which was due from Floyd to Lawson remained unpaid for fourteen years, when Lawson brought suit in the Circuit Court of Logan County, West Virginia, to collect the debt by the enforcement of the lien which he held on the land, the title remaining in him up to this time.

It seems that Floyd had sold the whole or a large part of the property he received from Lawson to one Johnston, who was made a defendant to that suit. This action was compromised on the third day of August, 1871, by a written agreement of that date, signed by Lawson, Floyd and Johnston. This compromise recognized that there was due to Lawson from Floyd the sum of $5051.30, which was a lien on the real estate described in the contract, and Johnston assumed and bound himself to pay to Lawson that sum in three instalments, with six per cent interest, and it was agreed that the property and control of the land should be in Johnston as an indemnity to him for the payment of this purchase money. This agreement is marked Exhibit B in the bill, and is as follows:

"This contract, made this 3d day of August, 1871, between Anthony Lawson, Geo. R. C. Floyd, and John W. Johnston, witnesseth: That whereas a certain suit is pending in the Circuit Court of Logan County, West Virginia, in which Anthony Lawson is plaintiff, and said Floyd and Johnston and others defendants, touching a balance of purchase money claimed by said Lawson for a tract of land near Logan Court House: Now, therefore, the said suit is to be dismissed at the next term of the court, each party paying his own costs, and all matters in said suit are settled on the following terms, viz.: A note executed by A. Lawson to Geo. R. C. Floyd, which was filed by said Floyd as an offset against said Lawson in the said suit, is to be credited with the sum of $2760, as of the date of June 30th, 1858, being the amount, principal and interest, at that date, of the legacies given by the will of Mrs.

Letitia Floyd to Letty P. Lewis and Mikattie P. Johnston, which legacies were paid by said Lawson, the said payments so made being hereby ratified by said Floyd; and it is further agreed that said Johnston shall assume, and he does hereby assume and bind himself, to pay to Anthony Lawson the balance of said purchase money, amounting, principal and interest, at this date, to $4851.30, and the costs of said suit, estimated to be $200, making in all $5051.30, as follows, viz.: One-third on or before the first day of January, 1873, one-third on or before the first day of January, 1874, and one-third on or before the first day of January, 1875, all bearing interest at six per cent per annum from this date; and it is further agreed that said Lawson and said Floyd shall each, and they do hereby, bind themselves that the property and the control of the tract of land herein mentioned, sold by the said Lawson to said Floyd, estimated to contain 1000 acres, shall be in said Johnston as an indemnity to him, which is described as follows, viz.: All the land owned by said Lawson, lying below Kezer's Branch above Aracoma, lying back of the lots Nos. 5, 6, and 7, in the original plan of the town of Lawnsville (now Aracoma), including the following town lots, as laid down in said plan of the town of Lawnsville, viz.: Nos. 8, 9, 10, 11, and 12; thence down the river to box-elders, at the lower end of said Lawson's land; thence with the division line between said Lawson's land and McDonald's land; thence up the point of the ridge below the sugar-camp hollow to the back line of said Lawson's land; thence with the back line to said Kezer's Branch, and thence down the same to the beginning; but the said Lawson is to retain the legal title to said lands and lots as a security for the payment of the said purchase money, except the land and lots sold to Isaac Morgan and John and Urias Buskirk; and it is further agreed that said portions of said land as may be sold by said Johnston or his agent shall be conveyed by the said Lawson to the purchaser, upon the payment to him of the purchase money of the said portion, and the balance of the land, if any, not sold by the said Johnston or his agent to third parties, is to be conveyed by the said Lawson to the said Floyd when the said

sum of $5051.30 is paid, with its interest; and it is further agreed that the portions of land sold by Geo. R. C. Floyd to Isaac Morgan, being about fifty acres, at the lower end of the tract, and lots Nos. 11 and 12 in the original plan of the town of Lawnsville, now Aracoma, lying between the river and the present street, and extending down to the lower corner of the stable, and thence to the river, sold to Urias Buskirk, shall be ratified, and the legal title shall be conveyed by said Lawson to the said Morgan and to the said Buskirk, respectively, or to such persons as they shall in writing direct, whenever requested to do so by said Floyd. And the said Lawson shall convey all the old patent lands with general warranty and the back lands with special warranty.

"Witness the following signatures and seals.

"A. LAWSON.          [Seal.]
"GEO. R. C. FLOYD.          [Seal.]
"JOHN W. JOHNSTON.          [Seal.]"

In October, 1877, the present bill in chancery was brought by Floyd against Lawson and Johnston, and divers persons who had purchased from Johnston parts of the land. The case being removed into the District Court of the United States for the District of West Virginia, various proceedings were had, all the parties answered, and the record presents considerable complexity and irregularity.

The purpose of Floyd's bill was to enjoin Johnston from making any further sales of the land, and to enjoin Lawson from any further enforcement of his claim for the sum recognized to be due by the agreement of 1871. He based the relief thus sought on the ground that the sale to him of the Lawson property was by a contract for a thousand acres of land, and that in the compromise agreement of 1871 this provision was repeated.

His contention is, that by the language of the contract Lawson sold him a thousand acres of land, which he is bound to make good; also, that in the conversations preliminary to the execution of that contract, Lawson represented to him that there was a thousand acres in the tract which he was

selling to him, and that he, Lawson, knew very well about how much land there. was, while Floyd himself was utterly ignorant of the extent of the tract, and relied upon Lawson's statements upon that. subject. He also alleges that these statements of Lawson were false and fraudulent, and intended to deceive him; that before bringing this suit he, the plaintiff, had an accurate survey made of the land according to the boundaries mentioned in the contract, and that, instead of there being a thousand acres, as represented by Lawson, there were only 592 acres, leaving a deficiency of 408 acres. He claims that Lawson should be held to account for this deficiency, at the average value of ten thousand dollars for the thousand, and that Lawson and Johnston had been selling off parts of the land, the purchase money on which went to Lawson to pay the amount supposed to be due to him. If deduction is made for the deficiency in quantity, he prays that Johnston and Lawson be held to account, and for such relief as may be just and right.

Lawson answers this bill by denying emphatically that the land was a sale by the acre, or t' v: it was ever considered to be such; denies that the contract on its face is susceptible of any construction which binds him for the quantity of a thousand acres, that he ever made any representations with regard to the quantity that was in the tracts which he sold, or that he knew anything more about the quantity within the boundaries mentioned in the contract than Floyd did, and denies any fraudulent purpose or intent. He says that the sale was an exchange of lands in the lump, and the phrase " about 1000 acres of land lying on the east side of Guyandotte and north of Aracoma," and particularly described by its boundaries, was understood by both parties to be a conjectural estimate of the quantity contained therein, and neither a warranty nor a representation that there was that much land there. He also avers that the repetition of the description in the compromise agreement fourteen years afterwards, where it is said that the land " sold by said Lawson to said Floyd," the boundaries of which are given with more precision, is " estimated to contain 1000 acres," cannot fairly be

construed to be a warranty of sale of that many acres of land.

Testimony was taken on this subject, mainly consisting of that of Floyd and Lawson, and the court, after deciding that Lawson was bound to make good the quantity of a thousand acres of land or account for the deficiency, had a resurvey made, in which it was ascertained that the amount of the deficit was 368 instead of 408 acres, for which the court de cided Lawson to be responsible. The case was then referred to a master, who made two or three reports, which were excepted to, and then to another master to state the accounts between the parties on the basis of the court's decision that Lawson should account for the quantity which was lacking. Further reports were made and exceptions taken, and reports filed after the decrees, in a very irregular manner. A final decree was rendered by the court in favor of Floyd and against Lawson for the sum of $5046.40, with interest thereon from the first day of November, 1883, from which decree Lawson takes the present appeal.

It is proper to state that a cross-bill was filed by Lawson, insisting upon his right to recover the sum found to be due in the compromise of 1871, and that it be held to be a lien on the property and enforced against it by decree of the court.

The principal contest, and indeed the only one, necessary to be decided in this court, is, whether Lawson should be held responsible for the 368 acres, which the land he put into the exchange with Floyd fell short of the amount of a thousand acres; for it does not seem to be disputed that upon an actual survey of the boundaries according to the contract there was that much less than that quantity within its area. The question of this responsibility of Lawson presents itself in two aspects:

First, whether, apart from the written contract of 1857, and at or about the time it was made, Lawson made representations in regard to the number of acres within the boundaries of the tract which he was selling, under circumstances that authorized Floyd to rely upon them as true, and that these representations were either intentionally false and made to deceive or were in fact untrue and known to Lawson to be so.

Second, whether, upon a fair construction of the contract, it is an agreement to sell and convey a thousand acres of land for the sum of ten thousand dollars, or whether it is a contract to convey the tract of land described in the agreement, which was supposed by the parties to contain about a thousand acres, without any obligation on the part of Lawson that there should be that much.

It would serve no profitable purpose to go over the testimony concerning representations or statements made by Lawson at the time of the making of the original contract, or at the time the compromise of 1871 was entered into, with regard to the quantity of land in the tract. The evidence is almost exclusively that of Floyd and Lawson, and it will be sufficient for the purposes of this decision to say that it does not leave upon us the impression that Lawson made any positive representations as to the quantity of land within the boundaries described, and especially as to the tract containing a thousand acres, much less any statements on that subject which were intended to deceive, and which he knew to be false or untrue.

Johnston, who was a brother-in-law of Floyd, as he states, and a lawyer, and who drew the compromise agreement of 1871, was introduced as a witness in the case. He says that he does not recollect hearing Mr. Lawson make any statement or representation to Mr. Floyd at that time about the land. He then says:

"I wrote the contract, Messrs. Floyd and Lawson sitting at the table. When I came to that part of the contract where I had to describe the number of acres I asked the question, addressed to both of them, how many acres there were. Mr. Floyd said, 'A thousand.' Mr. Lawson said, 'No; I won't be bound to any particular number of acres; there are several tracts, and I don't know how they would run out.' Then I used the language contained in the contract describing the land, which seemed to be satisfactory to them both."

It is not easy to resist the conclusion that at this moment, when they were compromising a troublesome lawsuit, the fag-end of the controversy about all these lands, and the writing embracing that compromise was being drawn up for both of

them to sign, and when the scribe put to them both the question as to the number of acres to be inserted in this description, their attention must have been called to that matter as one of importance, if either of them looked upon the number of acres as an essential part of the contract. And when Floyd suggested the words "a thousand," and Mr. Lawson said "No; I won't be bound to any particular number of acres; there are several tracts, and I don't know how they would run out," and Floyd made no objection to that statement, but consented to the use of the words "estimated to contain 1000 acres," the evidence seems to us satisfactory that, at least at that time, it was not considered that Lawson was bound for the thousand acres, or for any particular quantity of land.

As regards the question of law arising on the construction of the words "about 1000 acres of land" in the original contract, and especially the similar expression used in the compromise agreement, if there was nothing but the language to be looked to, it must be confessed that under the state of the authorities on that subject it would not be very easy to arrive at a conclusion entirely satisfactory. But in a case of this kind it is eminently proper to consider the circumstances surrounding the parties, and which would probably influence them in making the contract, at the time it was entered into. These, we think, throw much light on the question in this case, and leave but little doubt that it was not intended to bind Lawson to any particular number of acres in the transfer which he made to Floyd, but that the transaction was an exchange of different tracts of land between the parties to the contract, the parcels belonging to each of them being estimated in the lump or indicated by the boundaries and descriptions given in the instruments.

The case is not that of a purchase, standing alone, of a tract of land by one person from another, which is to be paid for by a particular sum of money. It is a case of an exchange of several tracts of land between the parties. This was a governing element in the transaction. The consideration received by Lawson for the land which he was to convey to Floyd was not $10,000 in money, but two distinct pieces of land described

by the names of the places, to which Floyd agreed to give
him a good title.

It is obvious that the parties in making this exchange also
had reference to the further circumstance that Lawson would
have to pay out over $18,000 to relieve the land he was to
receive from Floyd from liens, a part of which were in judg-
ments or decrees. The contract, then, is not to be construed
by that strict rule in regard to the quantity of land which
Lawson was to convey to Floyd that might govern its inter-
pretation if it were an independent purchase to be paid for in
money.

In the description of the land that Floyd sold to Lawson it
is described as "two several tracts of land, lying in the west
end of Burke's Garden, in the county of Tazewell, one known
as the Waterford Place and supposed to contain 802 acres,
and the other known as the Smith Place, adjoining the other,
and supposed to contain 467 acres." The value of these par-
cels was estimated at $26,000. There is also an uncertainty in
the suggestion as to the amount of liens on these lands. It
was "supposed to be $8410" as to one tract, and $9850 as to
the other. It is in accordance with this loose and general
way of describing these lands that the phrase "about 1000
acres of land" is used in the original contract in regard to
that belonging to Lawson.

After the statement of the agreement of Lawson to pay the
liens on the lands conveyed to him by Floyd, the contract
proceeds : "And also to convey to the said Floyd the property
of said Lawson at Logan Court House, consisting of five half-
acre lots, viz.: Nos. 8, 9, 10, 11, and 12 in the original plan of
the town of Lawnsville, now Aracoma, and about 1000 acres
of land lying on the east side of Guyandotte and north of
Aracoma ; being all the lands owned by said Lawson below
or north of Kezer's Branch, lying back of lots Nos. 6 and 7
and below the public square, and down as far as McDonald's
land ; and the said Lawson puts the property at $10,000."

It is not easy to see that, under the circumstances of this
exchange of property, either party was binding himself by
this loose language to a definite number of acres in the land

which he was conveying to the other; and it seems probable that the sum of $26,000, said to be the value of the Floyd land, and $10,000, the value at which the tract of Lawson was put, was conventional, and adopted as a mode of adjusting the terms of the exchange, and was not intended or supposed by either party to be the actual value of the property so described.

It will be observed, also, that the description of the lands to be conveyed by Lawson is, "all the lands owned by said Lawson" in that place, with a sufficient designation of the locality to enable anybody to find out where it is. It is also evident that a small part of this land was bottom land, lying on the Guyandotte River and near the town, and therefore of considerable value, while the larger part of it ran up on to the mountain ridges. In accordance with this understanding, the original contract states that "Lawson is to make the said Floyd a deed, with general warranty and relinquishment of dower, to the above described property, except one recent grant and part of another tract lying back from the river, which he is only to convey specially;" thus showing the difference in value attached to different parts of the land.

In the description found in the articles of compromise, which were made fourteen years after Floyd had obtained possession and control of the parcels allotted to him, and after legal proceedings to collect the purchase money, they seem to have made a more definite description of the land by metes and bounds and by corners and objects than was made in the original contract; and, according to the statement of the conversation which took place at that time, as testified to by Johnston, it is fair to suppose that this more definite description was intended to stand as the only means of ascertaining what was sold, leaving no obligation as to the particular quantity of land that might be found within its limits.

It is also to be noted, that in addition to the time which had elapsed while the property was under Floyd's control and possession, between the time of the original sale and the compromise of 1871, seven years more passed during which he was selling off portions of it to raise money to pay Lawson, and

that during all this time he made no complaint of any deficiency in the quantity, nor of any other fault which he found in regard to the property received by him from Lawson. It is true that this consideration is not conclusive, as the contract still remained an executory one, the title remaining in Lawson as security for the unpaid purchase money, but it affords a strong presumption that with such a large deficit Floyd had ample opportunity to discover that there was only about two-thirds of the quantity which he claimed to have purchased, and that if he had understood the contract as obliging Lawson to convey or make good to him the full amount of one thousand acres of land he would long before have ceased to pay Lawson that which he did not owe him, under the construction of the contract which he now asserts, and would not have submitted to a forced sale of the property by Johnston to raise money for that purpose.

Nor do we think it unimportant to consider that this compromise agreement of 1871, made fourteen years after Floyd was in the full possession and actual control of the land, and executed in an adjustment of a suit for the very purchase money, which Floyd now seeks to recover back, must have been made with a fair knowledge of the location, boundaries, and description of the land in controversy, and that it was determined at that time to describe it with more particularity as to metes and bounds, and to reject a phrase by which Lawson might have been bound for a thousand acres, substituting in its place an expression which left it in the form of a conjectural estimate of the quantity therein contained.

Under all these circumstances we are of opinion that Lawson is under no obligation to make good the difference between the amount of a thousand acres and the quantity found within the boundaries by actual survey. The decree of the court, based upon the erroneous idea that he should be held so accountable, must therefore be reversed.

As this error pervades all the accounting, and all the reports of the referees to state the accounts between the parties, it is not possible for this court to make a correct accounting and state what the decree should be, taking into consideration the cross-bill and the original bill.

The case is therefore

*Remanded to the District Court, with directions to take an account on the principles here established, and to render a decree accordingly.*